Judith KNISLEY, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. C–3–91–144.

United States District Court,
S.D. Ohio, W.D.
at Dayton.

April 1, 1993.

Arthur Robert Hollencamp, Dayton, OH, for plaintiff.

Brendan F. Flanagan, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, DC, for defendant.

## DECISION AND ORDER
## FOR JUDGMENT

MERZ, United States Magistrate Judge.

This is an action under the Federal Tort Claims Act by Plaintiff Judith Knisley to recover for legal malpractice with respect to the Separation Agreement between herself and her former spouse, Master Sergeant Carl Knisley.

The parties unanimously consented to full magistrate judge trial authority under 28 U.S.C. § 636(c) and the case was referred on that basis (Doc. # 34) and tried to the Court without a jury on March 22–24, 1993.

The Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52 are embodied in the following opinion.

Plaintiff Judith Knisley was married in September, 1966, to Carl Knisley, an enlisted member of the United States Air Force.[1] While Ms. Knisley was not employed outside the home for most of her marriage, by 1985 she had become travel coordinator for the 1815th Test Evaluation Squadron, stationed at Wright–Patterson Air Force Base, Ohio ("WPAFB"). At that time her husband was notified of reassignment to Mons, Belgium, at NATO SHAPE (Supreme Headquarters, Allied Powers, Europe). Because of a one year break in service, MSgt. Knisley would not reach his twentieth anniversary of enlistment for some time. His wife understood that he had an option of accepting a two-year assignment in Belgium, unaccompanied by his family, or a three-year assignment accompanied by them. Although their marriage

---

1. No record references are made to trial testimony because the testimony has not been transcribed. Exhibits admitted in evidence are referred to thus: Joint Exhibits—"JX"; Plaintiff's Exhibits—"PX"; Defendant's Exhibits—"DX."

had been undergoing some difficulties because she suspected him of infidelity, Ms. Knisley decided to accompany her husband to Europe, at the urging of friends at work.

The Knisley family had acquired a home in Greenfield, Highland County, Ohio, and had recently put a second mortgage on it to finance remodeling. Nonetheless, they were only able to lease it as of January 1, 1986, for approximately $300 per month less than the mortgage payments. The family had also acquired a new car which was heavily financed. Ms. Knisley took an unpaid leave of absence from her job at WPAFB, but expected to be able to find employment shortly after arriving in Belgium.

Living conditions in Belgium were not what Ms. Knisley had hoped. She and MSgt. Knisley had talked for years about a European tour of duty as an occasion to see Europe, but initially she found herself stuck in a country home with her three children, no transportation, no telephone, and a frequently-absent husband because of his TDY assignments. Nor was she able to find employment promptly and she was concerned about the family's financial situation. By March she had decided to return to the United States and go back to her job at WPAFB.

Ms. Knisley testified that she told her husband of her intention but he was not cooperative in arranging transportation. Finally, in March, 1986, she went to the Army Legal Assistance office in Brussels, where she had been directed from the Legal Assistance Office in Mons. She was then introduced to Captain David Riddle, an active duty Army officer then serving as an Army Legal Assistance Officer in Brussels. She told him that she wanted to return to the United States without her husband or children.

Ms. Knisley testified Captain Riddle did not talk to her about a separation agreement during this first visit, but told her to discuss the separation with her husband and if they wanted to proceed, to draw up a list of property and debts and return to see him. MSgt. Knisley's recollection is that his first notice of any intended separation was when Ms. Knisley handed him a draft separation agreement with blanks to be filled in and he then proceeded to prepare lists of property and debts. Captain Riddle did not testify on this precise point. Whatever the exact sequence, the first draft of a separation agreement which is in evidence, Joint Exhibit VI (which is also the first draft any witness remembered), is clearly more than an arrangement to cover a military spouse's returning from an overseas assignment without her husband; indeed, it does not deal at all with what Ms. Knisley testified was the most important detail: who was going to pay for the travel. Instead, it reads as if it were arranging a permanent separation of a married couple in anticipation of a possible divorce. Although Ms. Knisley testified she never contemplated a divorce or even a permanent separation, her testimony on this point is not credible under the circumstances. She is a highly literate person, having handled complex secretarial work and all of the family business matters. Captain Riddle had advised her that if she went back to the United States without her husband or children, she could be charged with desertion, but a simple acknowledgment in writing by her husband of his agreement with what she intended to do would have been sufficient if a permanent separation were not contemplated. Whatever her initial intentions when she approached Captain Riddle, she understood by the time she signed Joint Exhibit 8 that the agreement at least was permanent, whether or not she and her husband might ever decide to live together again.

The second draft of the Separation Agreement, JX VII, included a choice of law clause, Ñ18, mistakenly designating the State of Washington for the governing law. It also contained Ñ17 which was an express waiver of any rights Ms. Knisley might have to participate in MSgt. Knisley's military retirement pay. By the time this second draft was prepared, MSgt. Knisley was being represented by Captain Thomas Emswiler of the Army Legal Assistance Office in Mons. By Army policy, to prevent conflicts of interest, lawyers from different Legal Assistance Offices were to represent the spouses in any contested family law matter. By arrangement between Captains Riddle and Emswiler, the latter always handled the military

member and the former always handled the dependent. Captain Emswiler believed he may have inserted ÑÑ 17 and 18. A choice of law clause naming Ohio would have made sense since both parties resided in Ohio. Ñ 17 represented MSgt. Knisley's desires; he testified he was not willing to divide his military pension because he was assuming all the marital debts and Ms. Knisley had her own retirement under federal Civil Service.

While MSgt. Knisley wanted an explicit waiver of the military pension, Ms. Knisley would not sign the separation agreement with Ñ 17 in it; it is stricken out on JX VII in her own hand. MSgt. Knisley was willing to sign with the Separation Agreement silent on the subject. Captain Riddle had at trial only a general recall of what he told Ms. Knisley about the separation agreement, but that general recall was that he told her she had rights to the retirement pay which she would waive if she signed the separation agreement in the form of JX VI or VIII, even though they both do not expressly mention the subject. Presumably this is because of the effect of Ñ2 which is a general waiver of rights not dealt with. Ms. Knisley's more specific recall is that Captain Riddle passed on to her what he remembers he was told by Major Johnson, the Deputy JAG in Mons, to wit, that a sympathetic court might allow later litigation of the pension rights in a divorce action. It is clear that both Carl and Jude Knisley rejected language which would have said they agreed to agree later on any division. In any event, both parties signed the separation agreement in its final form in Captain Riddle's office and Ms. Knisley returned to the United States with the two younger children.

Once she had returned to the United States, Ms. Knisley resumed her job at WPAFB. Within a short time, she had taken up residence in an apartment in Fairborn, Greene County, Ohio, and had begun a sexually intimate relationship with one of her co-workers, Chief MSgt. David Morgan. She and Morgan had worked together before she went to Belgium, and he was responsible for

processing her requests for extensions of her leave without pay while she was there.

In May, 1986, Chief Morgan had visited Ms. Knisley in Mons in the company of a Lieutenant Ritter. Both he and Ms. Knisley admit that on the second evening they were together, they kissed. Chief Morgan testified further that on this same occasion Ms. Knisley became sexually aggressive to the point of partially disrobing. Ms. Knisley denied that this happened, but the Court credits Chief Morgan's testimony which is more consistent with the course of the relationship they pursued immediately after Ms. Knisley returned from Belgium.

The physical relationship between Chief Morgan and Ms. Knisley ended September 26, 1986, although they continued to work together and to be friends. However, Ms. Knisley was apparently emotionally upset over the relationship as she sought counseling on several occasions in October from the WPAFB Mental Health Unit and was counseled by Dr. Ray Crosby, a psychologist at the Unit.

Also sometime in the fall of 1986, Ms. Knisley became concerned about damage being done to the family home by the tenants. She approached attorney Ralph Phillips, an attorney for whom she had once been employed who had done previous work for the family and who had drafted the lease for the home, for advice as to what could be done. During that visit, which occurred sometime before the end of December, 1986, she furnished Phillips with a copy of the Separation Agreement. He exclaimed "Ridiculous!" when he saw that she was not getting any child support or alimony, but professed ignorance about separation agreements. He told her nothing could be done about the damage, that she should wait until the lease expired to get the tenants out of the house.[2]

In April, 1987, Ms. Knisley was referred to attorney Richard Brown. His first appointment with her was April 16, 1987 (PX 15). Ms. Knisley's claim of legal malpractice under the Federal Tort Claims Act was filed nearly two years later on April 12, 1989 (DX

---

2. So far as this Court is informed, Ms. Knisley has not sought legal malpractice damages against Attorney Phillips for drafting a lease which could not be terminated for destruction of the property by tenants.

L). It was eventually finally denied by the United States Army by letter to Mr. Hollencamp, her present counsel, on October 5, 1990 (JX I), and this suit followed on April 4, 1991.

On August 13, 1987, Ms. Knisley filed an alimony-only action [3] against MSgt. Knisley, *Knisley v. Knisley*, Case No. 87-DR-488 (DX N). MSgt. Knisley counterclaimed for divorce. In that litigation the Greene County Common Pleas Court, apparently not being the "sympathetic court" contemplated by Major Johnson, refused to open the pension division question and concluded that Ms. Knisley had finally waived any rights thereto by signing the Separation Agreement in its final form. Ms. Knisley appealed from the final decision on several points, including this one. The Greene County Court of Appeals in *Knisley v. Knisley*, its Case No. 88 CA 92, 1989 WL 74035, upheld the Greene County Common Pleas Court's exercise of judicial discretion in confirming the Separation Agreement and refusing to divide the military pension (DX N).

At all times pertinent to these proceedings, Captain David A. Riddle was an active Army commissioned officer, a member of the Judge Advocate General's Corps, and a legal assistance officer in the Army Legal Assistance Program.

Captain Riddle received the Juris Doctor degree from California Western University in 1977. Captain Riddle's law school curriculum included no courses in domestic relations or family law. In accordance with its standard practice, the Army Accession Board made no inquiry with regard to the content of Captain Riddle's law school curriculum. Having received his undergraduate degree with high honors from the University of Hawaii in 1974, Captain Riddle also received an LL.M. *cum laude* in International Comparative Law from the University of Brussels in 1985.

Captain Riddle was licensed to practice law in the State of Hawaii, effective April 21, 1978, and maintained an active status to do so through June 28, 1984. Effective June 29, 1984, Captain Riddle's legal license was transferred from active to inactive status at his request. He has been ineligible to practice law in the State of Hawaii since that time and has not been granted or denied a license to practice law by any other State. No evidence was presented to this Court relating to this transfer to inactive status from which any adverse inference as to the quality of Captain Riddle's performance as an attorney could be drawn.

Captain Riddle attended the Officer's Basic Course at the Judge Advocate General's School in Charlottesville, Virginia, in 1977. That three-month duration course involved all aspects of military law, criminal law, evidence, law of war, domestic relations law, government contract law, international law, law of military installations and claims. It is a required introduction for all beginning JAG officers.

Upon completion of the Judge Advocate General's School's basic course, Captain Riddle was stationed at WESTCOM, Hawaii, from October, 1977, through October, 1978, where he served as claims attorney and trial counsel (prosecutor). In 1978, Captain Riddle took the prosecutor's course at the Northwestern University School of Law. Captain Riddle was the Chief of the Legal Assistance at WESTCOM, Hawaii, from October, 1978, to October, 1979.

Following that duty assignment, Captain Riddle took the one-week duration continuing legal education course at the Judge Advocate General's School, covering such topics as divorce, wills and estates, adoptions and name changes, non-support indebtedness, taxes, landlord/tenant relationships, consumer affairs, civil suits, Soldiers and Sailors Relief Act, powers of attorney, and personal finances. He was then assigned as Chief of Legal Assistance from October, 1979, to July, 1980, for the Eighth U.S. Army in Korea. From July, 1980, through June, 1982, Captain Riddle was Chief, SOFA Claims, U.S. Army Claims Services, Korea. From July, 1982, to May, 1984, he was Chief, Commis-

---

**3.** Ms. Knisley testified she understood she could not sue for divorce because her husband was in the uniformed service on an overseas assignment. Whether that is a correct understanding of the law is not material to decision of this case.

sions Branch, U.S. Army Claims Services, Europe, where he supervised the tax program. He performed no domestic relations legal assistance between August, 1980, and May, 1984.

After four to six years of service in the field, the Judge Advocate General Corps' members often return to the Judge Advocate General's School in Charlottesville, Virginia, for the one-year duration "graduate course" leading to an LL.M. degree.. Although Captain Riddle had been on active duty for eight years at the time of his representation of Plaintiff, he had not taken the graduate course at the Judge Advocate General's School. There was no evidence as to how officers are chosen for the graduate course, including whether they have any choice in the matter.

Captain Riddle was the officer in charge, NATO Support Activities Group, Brussels, Belgium, a subordinate headquarters to NATO SHAPE, from May, 1984, through December, 1986. In the Fall of 1986, he attended the 1986 USAEUR Legal Assistance CLE Course on the Uniformed Services Former Spouses Protection Act, after he had concluded his representation of Plaintiff.

Captain Riddle has never tried a· divorce case or taken a deposition. He has however, at all pertinent times provided legal advice and assistance to eligible personnel about their personal legal affairs at an authorized and established legal assistance office of the United States Army.

The Court was not given any general history of the Army Legal Assistance Program, but the parties are in agreement that the governing regulation for the pertinent time period is Army Regulation ("AR") 27–3, introduced in evidence as JX II, and effective April 1, 1984. In pertinent parts, AR 27–3 describes the following features of the Army Legal Assistance Program: It is governed by The Judge Advocate General who has responsibility for furnishing legal assistance officers with information on current developments in the law, model programs, and suggested procedures (Ñ1–4a). Commanders of installations or with general court-martial authority are authorized, but not required, to establish legal assistance offices (Ñ 1–4b).

Legal assistance officers provide legal advice and assistance to eligible persons about their personal legal affairs (Ñ1–4c). However, "Actions taken and opinions given on behalf of individual clients reflect the personal, considered judgment of the LAO [Legal Assistance Officer] as an individual member of the legal profession." (Ñ1–4(c)(2)). Priority in providing legal assistance is given to military members; as a matter of policy, other eligible individuals are to receive service if resources are available (Ñ 1–5).

Paragraph 1–9 incorporates by reference the American Bar Association Model Code of Professional Responsibility for LAO's, except when inconsistent with AR 27–3. Paragraph 1–10 provides that local conditions may require changes from the policy and procedures outlined in AR 27–3 and requires that variations be placed in writing and filed with Army Headquarters. No variations from AR 27–3 for the ·Mons or Brussels offices were offered in evidence.

Paragraph 2–3 provides that an LAO giving legal assistance enters into an attorney-client relationship. LAO's are encouraged to participate in civilian professional organizations (Ñ2–3(c)) and to communicate among themselves and with the Legal Assistance Branch of the JAG School in Charlottesville on clients' legal questions (*Id.*).

AR 27–1 (JX III) is the general regulation covering the entire Judge Advocate Legal Service, which essentially comprises military and civilians working under general command of The Judge Advocate General. That officer was required to manage the professional legal training within the Department of the Army. In order to aid in that management, the Judge Advocate General's School was established at the University of Virginia, Charlottesville, as a field operating agency. (AR 27–1, Ñ 2–2r)

The Judge Advocate General is also charged with the duty to recruit members and manage the careers of the members of the Judge Advocate General's Corps, specifically including the duty of technical supervision of active officers of the Judge Advocate General Corps (AR 27–1, Ñ2–2t(1)).

Finally, The Judge Advocate General is charged with guiding and assisting Judge Advocates in the discharge of their professional duties, including furnishing opinions, instructions, digests, special texts, and other technical information pertaining to the performance of their duties, orally or in writing. (AR 27-1, Ñ 2-2t(3)). Ñ 7-2(a)(3)(4) specifies further "In addition to common law library resources, complete and current copies of the State or geographic area's statutory, decisional, and administrative compilations must be available to legal assistance officers."

The Staff Judge Advocate General of a Command, Supervising Judge Advocate, or civilian attorney, or other members of the office designated by the Staff Judge Advocate, are required to supervise legal assistance activities under the Army Legal Assistance Program. Those individuals are to perform a role like that of a senior partner in a law firm and are authorized to review all office administration activities and procedures. (AR 27-3, Ñ 1-9c.).

There is no essential difference between a military position and a civilian position in the Army Legal Assistance Program. Both attorneys perform the same function—one is simply on active duty, and the other has an excepted federal service appointment.

As a pre-requisite to serving on active duty in the Judge Advocate General's Corps, all members are required to have graduated from an American Bar Association accredited law school, and to be licensed to practice law by a State. The Army Accession Board reviews the applications and files of applicants for active duty in the Judge Advocate General's Corps, prior to allowing them to enter into active duty. There is, however, no inquiry as to what courses were included in the law school curriculum of an applicant. The Army expects that successful applicants for active duty in the Judge Advocate General's Corps are fully prepared to practice law. To further prepare them for military law, however, members entering active duty are brought to the Judge Advocate General Corps School in Charlottesville, Virginia, where they are taught the specifics of the

military system in the ten-week "Basic Course."

The Army expects its Judge Advocate General Corps officers to meet the continuing legal education requirements of their licensing States, in order to maintain the Judge Advocate General's Corps officer's good standing. If a Judge Advocate General Corps member's licensing State has no continuing legal education requirements, then the Department of the Army imposes no continuing legal education requirement upon that member. At all times pertinent to these proceedings, the State of Hawaii (Captain Riddle's licensing State) maintained no continuing legal education requirement for its licensed attorneys. However, Captain Riddle attended the JAG School CLE program in Europe every year from 1984 through 1989.

Lieutenant Colonel (then Major) Charles Hemingway was assigned to the Legal Assistance Branch, Administrative Law Division, Judge Advocate General's School, Charlottesville, Virginia, from 1983 through June, 1986. During the final two years of that period, he was the Chief of the Legal Assistance Branch. His duties in that regard included providing instruction to students at the Judge Advocate General's School in the basic course, the graduate course, and continuing legal education programs, as well as other special programs presented by the Judge Advocate General's School.

During Col. Hemingway's tenure, continuing legal education courses were offered twice a year for a one-week duration each. In configuring those courses, the Legal Assistance Branch relied heavily on input from JAG Corps field officers as to what education they wanted and did not dictate to them what education they needed.

During the pertinent time period, it was extremely uncommon for a JAG Officer stationed in Europe to attend the continuing legal education courses provided at the JAG School, due to the cost and transportation involved. To accommodate this problem, the Legal Assistance Branch provided a one-week continuing legal education course in Europe with the same curriculum as in Charlottesville. In 1986 it included a section on

the Uniformed Services Former Spouses Protection Act. Course outlines for the CLE courses for 1984, 1985, and 1986 are admitted in evidence as DX I.

The second part of Lt. Col. Hemingway's duty assignment was to act as a resource for civilian and military legal assistance attorneys, world wide, and to gather materials which would be of use to them in their practices, try to identify and distribute resources, and respond to any inquiries. However, he was neither aware of, nor made inquiry to determine, what, if any, of the materials referenced in AR 27–1, Paragraph 7–2a(4) were available to Captain Riddle in the Brussels, Belgium, Legal Assistance Office.

The Judge Advocate General directed the Legal Assistance Branch of the Army to determine which were the most common areas of practice for Legal Assistance Officers, and then to develop resource materials in those areas. World wide statistical analysis validated that a substantial percentage of Legal Assistance Officer's case loads dealt with family law issues. In January, 1984, the Judge Advocate General's School of the United States Army published and disseminated to Judge Advocate General Legal Assistance Officers, under the Army Legal Assistance Program, the *All States Marriage and Divorce Guide* (JX IV). Included therein were chapters on marriage, divorce, and dissolution, drafting separation agreements, sample separation agreement provisions, a separation agreement work sheet, and a compilation of State laws in the legal topic area. The *All States Marriage and Divorce Guide* was generated as a result of a mandate from the Judge Advocate General, who recognized that although the Army could not provide to every legal assistance attorney every state and federal law publication, more was needed than was being done, in order to enable legal assistance practitioners to represent their clients effectively.

Equitable division of military pension as a marital asset was not mentioned in the 1984 edition of the *All States Marriage and Divorce Guide*. The preface indicated that it would be updated annually by the Legal Assistance Branch of the Judge Advocate General's School, but no update was completed in

1985. However, updated legal information was provided to legal assistance officers on the covered topics through *The Army Lawyer*, CLE's, and other publications.

The next update was published and disseminated in September 1986 (PX 9). That edition contained numerous references to the equitable division of military pension as a marital asset. Several alternative separation agreement provisions were included.

In providing assistance to its attorneys, the JAG Corps obviously has limited resources. Therefore, libraries around the world cannot be supplied with bound copies of all research materials which might be pertinent. Military members and dependents seeking legal assistance at any particular office may well be from anywhere in the United States. Provision of a fully equipped law library at each office would obviously be impractical. Instead, the JAG School provides resources to its attorneys through JAG-produced publications as well as libraries. The publications include *Readings in Legal Assistance* (DX C), *The Army Lawyer* (Pertinent excerpts at DX E), various All States Guides, *The Military Law Review*, regulations, and CLE outlines. Also available is a computer research source called "FLITE." Special Legal Assistance Attorneys located around the United States are available for consultation; a directory of the type introduced in evidence as DX F was provided to legal assistance attorneys during the pertinent time period. Also advice and assistance were provided directly from the JAG School and a network of JAG offices located around the United States.

The Preface to the *1984 All States Guide* states:

> [t]his book is intended to provide legal assistance officers with a basic understanding of the laws controlling the formation and dissolution of marriage ... Legal assistance officers are advised that these state and territorial laws are subject to amendment by legislature and interpretation by courts. Therefore, additional research and verification may be required. Legal assistance officers are also advised that the sample separation agreement provisions in Chapter 4 are presented to aid

you in the preparation of these agreements. These forms should not be used in whole or in part without a thorough understanding of the purpose and effect of each provision. This text does not purport to promulgate Department of the Army policy or to be directory in any sense.

The *Guide* further states that "[c]ertain kinds of property are subject to special marital interests ... this may include the spouse's retirement benefits." *Id.* at 2–8. Finally, the *Guide* cautions "[t]he legal assistance officer must be extremely cognizant of the relevant state law as well as the tax consequences of creating a separation agreement." *Id.* at 2–12.

## SUBJECT MATTER JURISDICTION

█ Plaintiff brought this action under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 671 et seq. This Court has exclusive subject matter jurisdiction over such claims under 28 U.S.C. § 1346(b). The United States contends that the Court lacks jurisdiction of Plaintiff's claims because they fall within the so-called foreign country exception (28 U.S.C. § 2680(k)) and discretionary function exception (28 U.S.C. § 2680(a)) to the FTCA.

## THE FOREIGN COUNTY EXCEPTION TO THE FTCA

In his Decision of March 19, 1992, District Judge Rice, to whom this case was assigned before referral, agreed with the Government's position in part. He found, and the trial record now confirms, that all of the legal services Captain Riddle performed for Ms. Knisley were performed in Belgium. Judge Rice granted the Government's Motion to Dismiss Plaintiff's claims insofar as they were grounded solely in the negligence of Captain Riddle. Although no judgment was entered on this Decision, it is now the law of the case.

Although the facts supporting and opposing Plaintiff's claim that Captain Riddle committed legal malpractice were thoroughly tried, there is no reason to disturb Judge Rice's conclusion. Neither facts inconsistent with Judge Rice's factual premises nor law in conflict with that upon which he relied has been presented to the Court subsequent to his Decision. There is accordingly no reason to reconsider that result and judgment will be entered dismissing all of Plaintiff's claims which purport to arise solely from any legal malpractice committed by Captain Riddle, as barred by the foreign country exception.

## CAPTAIN DAVID RIDDLE'S ASSERTED LEGAL MALPRACTICE

█ Even though the United States cannot be liable on a *respondeat superior* basis for any legal malpractice committed in Belgium, the question of whether Captain Riddle actually committed legal malpractice remains a potentially dispositive question. If Captain Riddle committed no legal malpractice in his representation of Ms. Knisley, then nothing the Army did in failing to adequately train, supervise, or properly equip him (the "Headquarters Claim" discussed below) could have proximately caused any damage to Ms. Knisley. For that reason, a great deal of evidence was presented on what advice Captain Riddle actually gave Ms. Knisley. Unfortunately, that evidence is completely inconclusive in the Court's mind.

As noted above, Plaintiff presented evidence of what she was told by Captain Riddle about the effect of the Separation Agreement as finally signed. She claims that he told her at one point that unless the parties had been married twenty years and MSgt. Knisley had twenty years service at the time of any divorce, she would not be entitled to any portion of his retirement. Plaintiff's expert Steven Dankof testified that was not an accurate statement of Ohio law in 1986. Captain Riddle's somewhat vague recollection is that he did not tell her this and that to have discussed waiver at all (which clearly was discussed, since it was in and out of the drafts), he would have had to tell her she had rights to a portion of the pension. The Court finds that this is more probably what happened. Thus this advice as given was an accurate statement of Ohio law in 1986, at least as testified to by Plaintiff's expert witness.[4]

---

4. Even the most perspicuous lawyer, viewing his task from Justice Holmes' perspective of predict-

Captain Riddle also testified that he told Ms. Knisley that her chances of prevailing in obtaining a portion of the pension in later litigation were slight without any mention of it in the Separation Agreement, but admits he may have passed on to her what he heard from Major Johnson: that a sympathetic divorce court might allow the question to be reopened. Mr. Dankof also testified that this was not necessarily an inaccurate statement of Ohio law, that some courts might have allowed it. He opined, for example, that the Montgomery County Domestic Relations Court (which sits in Dayton, Ohio, with this Court) would have been more likely to revisit the issue than the Common Pleas Court of contiguous Greene County which eventually heard the divorce case.

Ms. Knisley testified that Captain Riddle's advice was a good deal more certain than he remembers it, that he assured her the matter would be dealt with in a subsequent divorce action because the final agreement was silent and even insisted that she sign an acknowledgment that he gave her that advice.[5] Plaintiff's experts were asked to assume the truth of Ms. Knisley's version of the events and did so (See, e.g., p. 31 of the Greenberg Deposition).

The difficulty with Plaintiff's case at this point in its logical development is that the Court has not been told which acts or omissions of Captain Riddle are alleged to have been negligent or to have constituted legal malpractice. Plaintiff's apparent theory is that all of the facts and circumstances surrounding Captain Riddle's representation, taken together, constitute legal malpractice.

In part the Court's confusion is caused by the way in which hypothetical questions were presented to the expert witnesses. Messrs. Dankof and Greenberg were qualified as experienced Ohio domestic relations practitioners; indeed, the Court has no doubt of their qualifications, since each of them has a good reputation in the Dayton legal community for domestic relations work. Then each was asked to assume the truth of virtually all the facts, with immaterial variations, in Plaintiff's proposed findings of fact.[6] Having made that assumption, they were then asked for their conclusions as follows:

Q. ... do you have an opinion within the realm of a reasonable legal certainty as to whether or not Capt. David A. Riddle possessed the knowledge, skill and ability ordinarily possessed and exercised by members of the civilian legal profession so situated as to represent Jude Knisley with regards to the matters undertaken by Capt. David A. Riddle in furtherance of his representation of her during their attorney-client relationship?

. . . . .

A. ... he did not.

. . . . .

Q. ... do you have an opinion within the realm of a reasonable legal probability as to whether or not Capt. David A. Riddle while acting within the scope of his official employment and duties with the Department of the Army in connection with the attorney-client relationship entered into between he [sic] and Jude Knisley regarding the negotiation and execution of her separation and property settlement agreement with Carl Knisley was ordinarily and reasonably diligent, careful and prudent in discharging the duties he assumed?

. . . . .

A. He was not.

Q. Again, assuming the stated facts, do you have an opinion within the realm of a reasonable legal probability as to whether or not Capt. David A. Riddle represented Jude Knisley zealously within the bounds

---

ing what the courts will do in fact, could have guessed what court an eventual divorce case would have been litigated in. The parties' home was in Greenfield, Highland County, Ohio.

5. The alleged document has never been found and Captain Riddle did not recall that any such document had been created. .

6. There is only immaterial variance between the facts Plaintiff intended to prove and actually succeeded in proving, with the exception of some points on which Ms. Knisley was directly contradicted by other witnesses and the Court has decided to adopt a version which differs from the Plaintiff's. None of those variances has any bearing on the difficulty the Court has with the answers to the hypothetical questions.

of the law while acting within the scope of his official employment and duties of the Department of the Army in connection with the attorney-client relationship entered into between he [sic] and Jude Knisley regarding the negotiation and execution of her separation and property settlement agreement with Carl Knisley?

. . . . .

A. He did not.

Q. Again assuming the facts stated, do you have an opinion within the realm of a reasonable legal probability as to whether or not Capt. David A. Riddle competently represented Jude Knisley while acting within the scope of his official employment and duties with the Department of the Army in connection with the attorney-client relationship entered into between he [sic] and Jude Knisley regarding the negotiation and execution of her separation and property settlement agreement with Carl Knisley?

. . . . .

A. . . . he did not competently represent her.

(Greenberg Deposition, pp. 33–40). The questions asked of Mr. Dankof and the answers given by him were virtually identical.

Fed.R.Evid. 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

There was no impropriety in eliciting the opinions by use of a hypothetical question; Fed.R.Evid. 705 abolished only the requirement, not the option, of using this form.

■ Nor was there any impropriety in offering expert testimony on questions of law in this case.[7] The possible concern over invasion of the judge-jury relationship is not present in Federal Tort Claims cases which are tried to the bench. Even judges, who are "presumed" to know the law, could frequently find help in expert legal opinion orally delivered, as opposed to being found in books. Finally, if one takes Justice Holmes's perspective that law, at least in important part, is what courts do in fact,[8] expert testimony may be very useful in assessing legal malpractice in fields saturated with judicial discretion. The most important thing to know about, for example, a criminal sentencing or a domestic relations property division may be the reputation and practices of the judge before whom the proceeding will occur. Experienced counsel would certainly be expected to know this information, which cannot be found in any lawbook, and to use it in representing clients. Failure to know or use this type of information would at least be relevant on the question of how competent an attorney was.

However helpful expert legal opinion could have been in this case, the testimony actually offered is virtually useless because neither Mr. Greenberg nor Mr. Dankof was permitted to testify **how** Captain Riddle was unqualified, incompetent, or less than zealous. To put the matter another way, while this Court was very willing to hear where Messrs. Greenberg and Dankof thought Captain Riddle went wrong, they were never asked.

Because they were never asked how Captain Riddle failed to meet the requisite standard of care, any portion of the extensive hypothetical question might have been the key to their opinions. For example, Plaintiff's counsel put great emphasis on the fact that Captain Riddle's license in Hawaii was inactive, that fact was part of the hypothetical, and either expert might have found it critical. The Court, however, concludes it is meaningless: Captain Riddle was not purporting to practice law in Hawaii; the fact that his license was inactive is totally irrelevant on any other question, including whether he knew Hawaii law, Ohio law, or Belgian

---

7. See Baker, The Impropriety of Expert Witness Testimony on the Law, 40 U.Kan.L.Rev. 325 (1992).

8. Holmes, The Path of the Law, 10 Harvard L.Rev. 457 (1897).

law.[9]

Or take another possibility. It appears from his deposition that Mr. Greenberg believed that Army lawyers should not at all be involved in offering legal assistance in domestic relations cases, but he was not asked if this was the basis of his opinions.

Or it may be that Messrs. Greenberg and Dankof believe that Captain Riddle misstated Ohio law or mispredicted Ohio judicial behavior on whether the pension question could be revisited in a later divorce proceeding. If so, they were not asked.

Or it may be, as is lightly suggested in Mr. Greenberg's deposition, that he believes no lawyer should allow a military dependent client to sign a separation agreement silent on this subject or which purports, by its general terms, to waive all rights not dealt with. Again, he was not asked by Plaintiff's counsel. Probably having sleeping dogs in mind, Defendant's counsel also did not ask. And it was certainly not within the Court's province to conduct the examination of Plaintiff's expert witnesses.

Rather, the burden was on Plaintiff to prove the legal malpractice by a preponderance of the evidence and the Court concludes that Plaintiff has failed to prove that Captain Riddle's acts or omissions constituted legal malpractice.

## THE HEADQUARTERS CLAIM: THE STANDARD OF CARE

■ Presumably in an effort to avoid the foreign country exception, Plaintiff presented what Judge Rice characterized as a "headquarters" claim: that the Department of the Army failed to appropriately train, supervise, and equip Captain Riddle and that each of these failures took place within the continental United States and proximately caused Captain Riddle's failure to meet an appropriate standard of legal practice. The Court has already determined that Plaintiff failed

to prove Captain Riddle's legal malpractice, and therefore any failure to train, supervise, or equip could not have proximately caused Plaintiff any damage, but the standard of care portion of the Headquarters Claim has also been fully litigated and deserves decision.

No law has been cited to the Court on the standard of care governing an organization which employs attorneys and then makes them available to the general public for legal assistance. Only one case of liability directly for failure to supervise, as opposed to respondeat superior liability, is cited in the leading treatise, Mallen and Smith, *Legal Malpractice* 3d, § 5.5 (1989).[10]

■ Plaintiff's only theory of recovery is under the FTCA. Under that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." The liability is for tort claims and therefore determined by state tort law. *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Which State? The State where the tort was committed. See 28 U.S.C. § 1346(b). Thus if there was a tortious failure to train, supervise, or equip Captain Riddle which was committed in the continental United States,[11] it happened, based on Plaintiff's evidence, in the Commonwealth of Virginia, because both the Headquarters of the Department of the Army and the Judge Advocate General's School are located there, one in Arlington and one in Charlottesville.

What is the standard of care as to training, supervision, and equipment of employed attorneys in Virginia? As noted above, no case law was offered on this point and apparently none exists. To fill this gap, the parties offered expert legal testimony. Messrs. Dankof and Greenberg were again asked to assume virtually all of the facts in Plaintiff's proposed findings and then to give conclusory opinions "to a reasonable legal probabili-

9. The inactive status is logically irrelevant because it could not possibly have proximately caused Ms. Knisley any damage.

10. *Gautam v. De Luca*, 215 N.J.Super. 388, 521 A.2d 1343 (1987).

11. AR 27-3 provides for supervision for legal assistance officers of the type provided by senior partners in law firms by local supervising attorneys. But any tortious failure to supervise Captain Riddle locally in Belgium is not actionable because of the foreign country exception.

ty" whether the Army had duties to train, supervise, and equip Captain Riddle and whether it breached those duties. In each case . they responded as expected that the Army had the posited duties and that it had breached them.

As with their opinions on Captain Riddle's malpractice, these experts' opinions on the standard of care for supervision were less than useful because again they were not asked to offer any opinion on what it would have taken to adequately train, supervise, or equip Captain Riddle. For example, Mr. Greenberg may believe no attorney should be allowed to give advice on any State's domestic relations law unless he or she has available all of that State's statutory and decisional law. Or Mr. Dankof may believe that an attorney's supervisor should review every document he or she prepares. As with their opinions on Captain Riddle's conduct, their opinions on the headquarters claim are not really helpful to the Court.

In addition, there is serious question about the competence of their testimony. Messrs. Dankof and Greenberg are Ohio lawyers who candidly admitted they are not licensed in Virginia and do not know Virginia law. In contrast, Defendant presented an expert witness licensed on Virginia from the faculty of the Washington and Lee Law School who testified the Commonwealth of Virginia does not impose a duty to supervise, train, or equip an employed attorney on an employing organization. At the very least, Plaintiff's experts admitted lack of knowledge of Virginia law seriously undermines the weight of their testimony on the standard of care. See Mallen and Smith, Legal Malpractice 3d (1989), § 27.17.

Plaintiff's other approach to the standard of care on the Headquarters Claim was to assert that the standard is supplied by federal law. Plaintiff relies on 10 U.S.C. § 3065(e) which provides:

> (e) No officer of the Army may be assigned to perform technical, scientific, or other professional duties unless he is qualified to perform those duties and meets professional qualifications at least as strict as those in effect on June 28, 1950. If the duties to which an officer is assigned in-

volve professional work that is the same as or is similar to that performed in civil life by a member of a learned profession, such as engineering, law, medicine, or theology, the officer must have the qualifications, by education, training, or experience, equal to or similar to those usually required of members of that profession, unless the exigencies of the situation prevent.

Plaintiff's reliance on this statute is unavailing for several reasons. First of all, the statute is cited completely out of context. It is part of Chapter 307 of Title 10 which is devoted to prescribing the organization of the Army. No decisional law known or made known to the Court suggests that this statute was intended to create a standard of care for the protection of third parties who might deal with Army lawyers.

Secondly, there is no evidence of what "education, training, or experience" is usually required of members of the legal profession such that Captain Riddle's education, training, or experience would be less. The basic requirement for the practice of law is that one pass a bar examination and Captain Riddle had done that. Moreover, he had the basic law degree from an American Bar Association accredited law school. Indeed, he had also been awarded, before he became Plaintiff's lawyer, a Master's of Law degree; the Court takes judicial notice that no State of the United States requires the LL.M. as a condition of practice. If what Plaintiff was attempting to do was create an inference, from the conclusory testimony of Messrs. Dankof and Greenberg that Captain Riddle did not satisfy 10 U.S.C. § 3065, that there is some standard higher than a J.D. and admission to the bar of a State Supreme Court, she failed to do so, again because these witnesses offered no explanations of their conclusions.

If we put to one side the technical questions about which State's law controls and focus instead on what kind of supervision, training, and equipment are generally furnished to employed attorneys, it is difficult to fault the Army. What other law firm or organization employing attorneys routinely provides ten weeks of pure ·instruction to

starting attorneys?[12] How many offer an in-house ABA-accredited masters program?

As defense counsel emphasized at trial, the Army in substantial part relies on the ethical standards imposed on its legal assistance officers. They, like all American lawyers subject to the ABA Model Code of Professional Responsibility, are bound not to handle matters which they cannot handle competently or to associate other counsel with themselves in those situations.[13] This Court is not prepared to say that in every instance such reliance is or will be adequate, but it appears to be the common standard in the legal profession today, and Plaintiff has not proven that the Army is subject to any higher standard.[14]

In sum, the Headquarters Claim fails because Plaintiff has failed to establish the standard of care from which the Army allegedly deviated in its training, supervision, and equipping of Captain Riddle.

## THE HEADQUARTERS CLAIM AND THE DISCRETIONARY FUNCTION EXCEPTION TO THE FTCA

■ The Headquarters Claim also fails because of the Discretionary Function exception to the FTCA. 28 U.S.C. § 2680 provides in pertinent part:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion be abused;

This statute has recently been interpreted by the Supreme Court in *United States v. Gaubert*, 499 U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), where it held that, by reason of this exception, the FTCA did not reach negligent supervision of a savings and loan and rejected a suggested distinction between "policy decisions" and "operational decisions" offered by the Fifth Circuit.

The Court noted that "the purpose of this exception is to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," 499 U.S. at ——, 111 S.Ct. at 1273, quoting *United States v. S.A. Empressa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 at 814, 104 S.Ct. 2755 at 2765, 81 L.Ed.2d 660 (1984). It further held that the relevant question is not at what level in an administrative agency the decision is made, but whether the decision is "susceptible to policy analysis." 499 U.S. at ——, 111 S.Ct. at 1275.

The *Gaubert* decision (which was unanimous) is directly applicable to Plaintiff's Headquarters Claim. This Court will assume for the sake of argument that The Judge Advocate General has a mandatory duty to supervise, train, and equip the lawyers she or he assigns to legal assistance work. Even if that be the case, the manner in which those duties are carried out obviously calls for the exercise of discretion. For example, AR 27–3 and 27–1 call for the provision to legal assistance officers of technical legal information such as that found in a law library, but they do not purport to list the

---

**12.** Mr. Dankof admitted on cross-examination that he had been assigned to try a divorce case the very day after he was admitted to the bar, although he had taken no family law courses in law school. The assignment came from Lloyd O'Hara, at the time probably the most respected domestic relations attorney in the Dayton, Ohio, area and a senior partner in Smith & Schnacke, then Dayton's largest law firm.

**13.** It is interesting to note that the ethics of being a supervising attorney or organization is largely ignored in the older ABA Model Code. In the new Model Rules which the ABA now suggests be adopted, supervising attorneys are required to "make reasonable efforts to ensure that [those attorneys they supervise] conform to the Rules of Professional Conduct." Model Rule 5.1(b).

**14.** Of course, in most cases supervising attorneys or law firms will be liable for the malpractice of their employed attorneys on a respondeat superior basis and there is no need to consider "direct" liability for failure to train, supervise, or equip. That approach is not available to Plaintiff because of the foreign country exception.

books which the library must contain. Army Legal Assistance Officers in Belgium were provided with the *All States Marriage and Divorce Guide* and the *Family Law Reporter*, the latter being a very comprehensive compilation of decisions in the family law area, as well as other materials and access to other lawyers to consult. Certainly the decision whether particular law books ought to be provided is a discretionary one, calling for a judgment much like the judgment found protected in *Gaubert*. Similarly, the decision about how to supervise legal assistance officers calls for judgments balancing costs and needs. The sort of training to be provided also calls for the same kind of discretionary judgment.

Thus each area of conduct in which Plaintiff alleges the Army failed comes within the discretionary function exception. As the Supreme Court emphasizes in *Gaubert*, it is not the **level** at which the decision is made, either in the military hierarchy or in the level of generality of the decision, that is determinative, but whether the decision calls for policy analysis and judgment, which all of these decisions do. The Headquarters Claim is precluded by the discretionary function exception to the FTCA.

### THE STATUTE OF LIMITATIONS DEFENSE

Although the statute of limitations defense was thoroughly litigated, it involves a number of difficult factual questions which are not necessary to decide in light of the Court's decision on other dispositive questions.

### ORDER FOR JUDGMENT

In accordance with the foregoing opinion, the Clerk shall enter judgment dismissing the Complaint herein with prejudice.